IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

v.                                                                            Case 2:23-cr-20229-JPM-cgc

**DERRICK RICHARD,**

        **Defendant.**

---

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS**

---

Before the Court is Defendant Derrick Richard's Motion to Suppress. (Docket Entry ("D.E.") #26). The instant motion has been referred to the United States Magistrate Judge for Report and Recommendation. (D.E. #28). For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.

**I.**     **Background**

On November 16, 2023, a grand jury of this Court returned a one-count indictment against Defendant. (D.E. #1, #2). The Indictment charges that, on or about December 22, 2022, Defendant knowingly possessed a firearm in violation of Title 18, United States Code, Section 922(g)(1). The Indictment further charges that, before committing this offense, Defendant had at least three previous convictions for either serious drug offenses or violent felonies, or both, in violation of Title 18, United States Code, Section 924(e).

II. **Proposed Findings of Fact**

On December 22, 2022, Officer Andrew Linn of the Memphis Police Department ("MPD") received two calls to report to a house at 805 Hudson. (Transcript ("Tr.") at 5:10-11). Officer Linn was familiar with this house, as he estimates he had reported to it at least a hundred times during his fifteen-year career. (Tr. at 9:15-23).

Officer Linn testified that the first call reported people trespassing in the house, but upon his arrival, the doors were locked, the house was "all closed up," and the property owners were present. (Tr. at 5:19-6:2). Officer Linn testified that the second call reported people trespassing in the house, but one this occasion, it also reported that there was an individual with a firearm. (Tr. at 6:3-6; Tr. at 19:15-20:5). In the audio recording of the 911 call made by the property manager, she described the man she was calling about both as a trespasser as well as someone who was there helping another person move out. (Exh. 2 at :30-2:05). However, she was asked if she had seen any weapons, to which she responded that she had not. (Exh. 2 at 2:06-2:11). She did state that she felt threatened by a Black male wearing black pants and a cream-colored jacket. (Exh. 2 at 1:32-1:55).

Officer Linn was wearing a body camera while patrolling, and he activated it upon reporting to 805 Hudson on this second occasion. (Tr. at 6:7-7:23 & Exh. 1). Once activated, the body camera will immediately record video and will begin recording audio one minute later. (Tr. at 7:16-23; 14:20-15:12). The body camera recording reflects that he arrived at 805 Hudson and saw three individuals who were with Memphis Passive, which is "the company who is in charge of the house." (Tr. at 8:2-9:7, 10:6-23, 15:13-24, 17:25-18:6 & Exh. 1 at 0:00:38-0:00:54). Although the audio recording had not yet begun, Officer Linn testified that one of these individuals again advised that there were people trespassing in the house and that one man had a firearm. (Tr.

2

at 4:22-24; 9:9-10; 22:6-10).  Additionally, Officer Linn immediately recognized one of the women outside from prior complaints at this house.  (Tr. at 12:1-9).

      Officer Linn approached and entered an open side door of the house, at which point he encountered a man later identified as Defendant.  (Tr. at 18:10-12; Exh. 1 at 0:00:54-0:01:18).  Defendant was wearing black pants and a red jacket layered over a beige shirt, a plaid shirt, and a grey shirt.  Officer Linn was in full uniform but did not announce that he was with MPD.  (Tr. at 18:24-19:3).  Just after Officer Linn entered this side door and asked Defendant who he was, Defendant exited it.  (Tr. at 18:10-12; Exh. 1 at 0:01:12-0:01:18).  Officer Linn grabbed Defendant's left arm and repeatedly instructed him to "come here" and "stop."  (Tr. at 18:17-23; Exh. 1 at 0:01:18-0:01:27).  Officer Linn can he heard asking the individuals he first met on the scene if this was the individual they were "talking about," to which a man outside appears to nod affirmatively. (Exh. 1 at 0:01:27-0:01:29).  In response, Defendant repeatedly yells to them, "what'd I do?"  (Exh. 1 at 0:01:29-0:01:35).  Officer Linn testified that, during the course of the encounter, he understood Defendant to be the man the Memphis Passive employees were calling about.  (Tr. at 11:7-11).

      Moments after grabbing Defendant's arm, Officer Linn can be seen patting down Defendant's front left pant pocket, which has a noticeable bulge.  (Exh. 1 at 0:01:35).  As Officer Linn and another officer attempt to handcuff Defendant, he yells for them to let him go, resists being placed in handcuffs, and attempts to break loose from their grip on his arms.  (Exh. 1 at 0:01:35-0:03:43).  Within approximately two minutes, officers were able to detain Defendant on the ground.  (Tr. at 11:20-22; Exh. 1 at 0:03:43-0:04:08).  After detaining Defendant, Officer Linn saw the butt of a pistol sticking out of his pocket, and he removed it.  (Tr. at 11:23-12:11 & Exh. 1 at 0:04:51-0:04:46).

At some point after detaining Defendant, Officer Linn recognized him as having been involved in an incident at this same house earlier that month. (Tr. at 11:7-19; 13:5-7). Defendant was ultimately arrested for illegal possession of a firearm. (Tr. at 14:1-5). Officer Linn testified that he believed that Defendant was later questioned by a detective at Tillman station (Tr. at 20:15-22); however, the record does not include any post-arrest statements made by Defendant.

### III.     Proposed Analysis

The Fourth Amendment guarantees the "right of the people to be secure in their persons, house, papers, and effects against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. In cases where no warrant has been obtained prior to the search or seizure, the conduct must "be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Terry v. Ohio*, 293 U.S. 1, 20 (1968). Under this principle, searches, and seizures "'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions.'" *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quoting *Thompson v. Louisiana*, 469 U.S. 17, 19-20 (1984)).

Under the Fourth Amendment, there are three types of permissible encounters between the police and citizens: consensual encounters, investigative detentions, and arrests. *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000) (internal citations omitted). A consensual encounter can be initiated by a law enforcement officer without any objective level of suspicion of involvement in criminal activity. *Id*. During a consensual encounter, law enforcement officers may approach an individual and ask general questions so long as they refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free

to leave. *Id.* Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not on any subjective suspicion of criminal activity. *Id.* Because a person who voluntarily speaks with an officer during a consensual encounter is free to disengage at any time, the person is not seized for Fourth Amendment purposes. *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).

The second type of police-citizen encounter is the more-intrusive investigative detention or *Terry* stop, which must be supported by a reasonable, articulable, and objective suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Wiggins*, 828 F.2d 1199, 1200-01 (6th Cir. 1987). A reasonable suspicion is one that, based on the totality of the circumstances, is a "particular and objective basis for suspecting the person is involved in a crime." *United States v. Gross*, 662 F.3d 393, 398-99 (6th Cir. 2011). A mere hunch is insufficient to justify an investigative detention. *Id*. An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). A court must consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. *United States v. Sharpe*, 470 U.S. 675 (1985). An investigative detention is too long in duration if the police have not diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. *Id*.

During an investigative detention, officers may only proceed to "frisk," or pat down, an individual who they reasonably believe to be armed and dangerous. *United States v. Wilson*, 506 F.3d 488, 492 (6th Cir. 2007). "The sole justification [for such a pat-down] . . . is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion

5

reasonably designed to discover guns, knives, clubs, or other hidden instruments for the safety of the police officer." *Terry*, 392 U.S. at 29.

The third type of police-citizen encounter is an arrest. An arrest is reasonable under the Fourth Amendment if an officer has probable cause to believe that a crime has been, is, or is about to be committed. *United States v. Watson*, 423 U.S. 411, 417 (1976).

The questions presented here pertains to an investigative detention. Defendant argues that Officer Linn did not have reasonable suspicion that he was currently, or about to be, engaging in criminal activity or that he had committed any crime at the time he grabbed his arm and restricted his movement. Defendant further argues that Officer Linn did not have reasonable suspicion that he was armed and dangerous such that he may perform a pat-down.

With respect to the first question, the record reflects that the Memphis Passive property manager called 911 and stated that she had been threatened by a Black male at 805 Hudson. While the 911 call does not state that she had seen a firearm, Officer Linn testified that the Memphis Passive employees did inform him on the scene that the individual possessed a firearm. Although the 911 call identifies the individual both as someone there assisting with a move and as a trespasser, Officer Linn's testimony is that he was under the belief that Memphis Passive believed him to be a trespasser and that the individual was not permitted by Memphis Passive to be at the property. Additionally, while the 911 call identifies the individual as wearing a cream-colored jacket and Defendant is seen with a red jacket, a light-colored layer can be clearly seen beneath the red jacket. Defendant also fits the description as a Black male wearing black pants, and he appears to have been quickly identified by one man standing outside. Thus, it is RECOMMENDED that Officer Linn had reasonable suspicion that Defendant was either already

6

trespassing on the property and/or may be about to engage in criminal activity based upon the threats he had made upon the Memphis Passive staff.

With respect to the second question, Officer Linn testified that the individuals on the scene reported that the individual possessed a firearm, and within seconds, Officer Linn noticed a bulge on Defendant's left leg near his pant pocket. Officer Linn quickly patted down that specific area. Thus, it is RECOMMENDED that Officer Linn had reasonable suspicion that Defendant was armed and, when coupled with reports that he had made threats, that he was also dangerous. It is RECOMMENDED that Officer Linn's pat-down of the bulge in his left pocket was reasonable to ensure officer safety, particularly as Defendant began to resist detention, and that it was limited in scope to the search for a weapon. Accordingly, it is RECOMMENDED that Officer Linn's investigative detention and pat-down of Defendant does not run afoul of the Fourth Amendment.

Defendant further argued that any statements he provided following his arrest were tainted by the alleged unlawful detention such that it constituted fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). Here, it has been RECOMMENDED that there was no primary illegality that tainted any subsequent steps of the investigation. Accordingly, it is RECOMMENDED that any statements made by Defendant were not unconstitutionally obtained.

## IV. Conclusion

For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.

Signed this 30th day of May 2024

> s/ Charmiane G. Claxton
> CHARMIANE G. CLAXTON
> UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE SAID OBJECTIONS OR EXCEPTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER AND/OR FORFEITURE OF THE OPPORTUNITY TO RAISE OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**