# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 2:23-cr-20229-JPM |
| v. ) | |
| ) | |
| DERRICK RICHARD, ) | |
| ) | |
| Defendant. ) | |

## ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING MOTION TO SUPPRESS

Before the Court is the Report and Recommendation of Magistrate Judge Charmaine G. Claxton. (ECF No. 36.) Magistrate Judge Claxton recommended that Defendant's Motion to Suppress, filed March 18, 2024, be denied. (Id.; see also ECF Nos. 26, 27.) Defendant has objected to the Report and Recommendation, and the Government filed a Response. (ECF Nos. 41-42.) For the reasons discussed below, the Court **ADOPTS** the Report and Recommendation of Magistrate Judge Claxton. Defendant's Motion to Suppress is **DENIED**.

I.   **BACKGROUND**

On November 16, 2023, a grand jury charged Defendant, Derrick Richard ("Defendant" or "Mr. Richard") with one count of possessing a firearm having previously been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) Defendant filed a Motion to suppress "all evidence in this case" on March 18, 2024. (ECF No. 26 at PageID 40.) The Government filed its Response on March

28, 2024. (ECF No. 27.) The Motion was referred to Magistrate Judge Claxton on March 28, 2024. (ECF No. 28.) A hearing was held before Magistrate Judge Claxton on April 11, 2024. (ECF No. 34.) Magistrate Judge Claxton issued the Report and Recommendation on May 30, 2024. (ECF No. 36.) Defendant was granted an extension of time to file objections to the Report, which were timely filed on June 27, 2024. (ECF No. 41.) The Government filed their Response on July 11, 2024. (ECF No. 42.)

II.     **PARTIES ARGUMENTS**

Defendant was arrested after he was stopped by officers and a "frisk" revealed he was carrying a firearm. Defendant argues that the stop was a violation of his Fourth Amendment rights because the officers "did not have reasonable suspicion for the investigative detention" and "did not possess a reasonable suspicion that Mr. Richard might be armed and dangerous sufficient to justify frisking him for officer safety." (ECF No. 26 at PageID 36-37.) Defendant also argues that the illegal seizure and search led to Mr. Richard's detention and subsequent statement, and therefore must also be excluded as derivative evidence directly resulting from the alleged Fourth Amendment violations. (Id. at PageID 37-39.)

The Government agrees with the categorizations Defendant provides for the encounters between the Officers and Mr. Richard and argues that the investigative detention and subsequent frisk were supported by reasonable suspicion and appropriate in scope. (ECF No. 27.) The Government argues that "officers had a particularized and objective basis for suspecting Richards of criminal activity" based on the officer's observances and other permissible sources, and that the totality of the circumstances created reasonable suspicion for a precautionary search. (ECF No. 27 at PageID 42-45.) The Government also argues that even if the Court

finds the searches were unconstitutional, suppression is not justified because "[t]here was no wrongful police behavior that would require deterrence in this instance." (ECF No. 27 at PageID 46 (citing Herring v. United States, 129 S. Ct. 695, 698 (2009) (quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)).)

### III.  REPORT AND RECOMMENDATION

  a. *Findings of Fact*

Magistrate Judge Claxton's Report and Recommendation described its proposed findings of fact as follows:

> On December 22, 2022, Officer Andrew Linn of the Memphis Police Department ("MPD") received two calls to report to a house at 805 Hudson. (Transcript ("Tr.") at 5:10-11). Officer Linn was familiar with this house, as he estimates he had reported to it at least a hundred times during his fifteen-year career. (Tr. at 9:15-23.)
>
> Officer Linn testified that the first call reported people trespassing in the house, but upon his arrival, the doors were locked, the house was "all closed up," and the property owners were present. (Tr. at 5:19-6:2.) Officer Linn testified that the second call reported people trespassing in the house, but on this occasion, it also reported that there was an individual with a firearm. (Tr. at 6:3-6, 19:15-20:5.) In the audio recording of the 911 call made by the property manager, she described the man she was calling about both as a trespasser as well as someone who was there helping another person move out. (Ex. 2 at 0:30-2:05.) [The caller] did state that she felt threatened by a Black male wearing pants and a cream-colored jacket. (Ex. 2 at 1:32-1:55.)
>
> Officer Linn was wearing a body camera while patrolling, and he activated it upon reporting to 805 Hudson on this second occasion. (Tr. at 6:7-7:23; Ex. 1.) Once activated, the body camera will immediately record video and will begin recording audio one minute later. (Tr. at 7:16-23, 14:20-15:12.) The body camera recording reflects that [Officer Linn] arrived at 805 Hudson and saw three individuals who were with Memphis Passive, which is "the company who is in charge of the house." (Tr. at 8:2-9:7, 10:6-23, 17:25-18:6; Ex. 1 at 0:00:38-54.) Although the audio recording had not yet begun, Officer Linn testified that one of these individuals again advised that there were people trespassing in the house and that one man had a firearm. (Tr. at 4:22-24, 9:9-10, 22:6-10.) Additionally, Officer Linn immediately recognized one of the women outside from prior complaints at this house. (Tr. at 12:1-9.)
>
> Officer Linn approached and entered an open side door of the house, at which he encountered a man later identified as Defendant. (Tr. at 18:10-12; Ex. 1 at 0:00:54-0:01:18.) Defendant was wearing black pants and a red jacket layered over a beige shirt,

3

> a plaid shirt, and a grey shirt. Officer Linn was in full uniform but did not announce that he was with MPD. (Tr. at 18:24-19:3.) Just after Officer Linn entered this side door and asked Defendant who he was, Defendant exited it. (Tr. at 18:10-12; Ex. 1 at 0:01:12-0:01:18.) Officer Linn grabbed Defendant's left arm and repeatedly instructed him to "come here" and "stop." (Tr. at 18:17-23; Ex. 1 at 0:01:18-0:01:27.) Officer Linn can be heard asking the individuals he first met on the scene if this is the individual they were "talking about," to which a man outside appears to nod affirmatively. (Ex. 1 at 0:01:28-29.) In response, Defendant repeatedly yells to them: "What'd I do?" (Ex. 1 at 0:01:29-0:01:35.) Officer Linn testified that, during the course of the encounter, he understood Defendant to be the man the Memphis Passive employees were calling about. (Tr. at 11:7-11.)
>
> Moments after grabbing Defendant's arm, Officer Linn can be seen patting down Defendant's front left pocket, which had a noticeable bulge. (Ex. 1 at 0:01:35.) As Officer Linn and another officer attempt to handcuff Defendant, he yells for them to let him go, resists being placed in handcuffs, and attempts to break loose from their grip on his arms. (Ex. 1 at 0:01:35-0:03:43.) Within approximately two minutes, officers were able to detain Defendant on the ground. (Tr. at 11:20-22; Ex. 1 at 0:03:43-0:04:08.) After detaining Defendant, Officer Linn saw the butt of a pistol sticking out of his pocket, and he removed it. (Tr. at 11:23-12:11; Ex. 1 at 0:04:51-0:04:46.)
>
> At some point after detaining Defendant, Officer Linn recognized him as having been involved in an incident at this same house earlier this month. (Tr. at 11:7-19, 13:5-7.) Defendant was ultimately arrested for illegal possession of a firearm. (Tr. at 14:1-5.) Officer Linn testified that he believed Defendant was later questioned by a detective at Tillman station. (Tr. at 20:15-22.) [T]he record does not include any post-arrest statements made by Defendant.

(ECF No. 36 at PageID 52-55 (cleaned up).)

      b.  *Recommendation*

After summarizing the applicable legal standard, Magistrate Judge Claxton recommended the following analysis:

> With respect to [investigative detention], the record reflects that the Memphis Passive property manager called 911 and stated that she had been threatened by a Black male at 805 Hudson. While the 911 call[er] did not state that she had seen a firearm, Officer Linn testified that the Memphis Passive employees did inform him on the scene that the individual possessed a firearm. Although the 911 call identifies the individual both as someone there assisting with a move and as a trespasser, Officer Linn's testimony is that he was under the belief that Memphis Passive believed him to be a trespasser and that the individual was not permitted by Memphis Passive to be at the property. Additionally, while the 911 call identifies the individual as wearing a cream-colored jacket and Defendant is seen with a red jacket, a light-colored layer can be clearly seen beneath the red jacket. Defendant also fits the description as a Black male wearing black pants, and

4

he appears to have been quickly identified by one man standing outside. Thus, it is RECOMMENDED that Officer Linn had reasonable suspicion that Defendant was either already trespassing on the property and/or may [have been] about to engage in criminal activity based upon the threats he had made upon the Memphis Passive staff.

With respect to the second question, Officer Linn testified that the individuals on the scene reported that the individual possessed a firearm, and within seconds, Officer Linn noticed a bulge on Defendant's left leg near his pant pocket. Officer Linn quickly patted down that specific area. Thus, it is RECOMMENDED that Officer Linn had reasonable suspicion that Defendant was armed and, when coupled with reports that he had made threats, that he was also dangerous.  It is RECOMMENDED that Officer Linn's pat-down of the bulge in the left pocket was reasonable to ensure officer safety, particularly as Defendant began to resist detention, and that it was limited in scope to the search for a weapon. Accordingly, it is RECOMMENDED that Officer Linn's investigative detention and pat-down of Defendant does not run afoul of the Fourth Amendment.

Defendant further argued that any statements he provided following his arrest were tainted by the alleged unlawful detention such that it constituted fruit of the poisonous tree. Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).  Here, it has been RECOMMENDED that there was no primary illegality that tainted any subsequent steps of the investigation. Accordingly, it is RECOMMENDED that any statements made by the Defendant were not unconstitutionally obtained.

(ECF No. 36 at PageID 57-58.)

### IV. LEGAL STANDARD

Magistrate judges may hear and determine pretrial matters pending before a District Court, unless those matters are "dispositive."  28 U.S.C. § 636(b)(1)(A).  After hearing a referred matter, "the magistrate judge must enter a recommended disposition, including, if appropriate, proposed findings of fact." FED. R. CIV. P. 72(b)(1); see also Baker v. Peterson, 67 F. App'x. 308, 310 (6th Cir. 2003).  Report and recommendations regarding motions to suppress in criminal cases are reviewed *de novo*. 28 U.S.C. § 636(b)(1)(A); U.S. v. Raddatz, 447 U.S. 667, 673 (1980).

The Fourth Amendment guarantees the "right of the people to be secure in their persons, house, papers, and effects against unreasonable searches and seizures. . . ." U.S. Const. amend.

IV. The Fourth Amendment is not unlimited: "the Constitution forbids . . . not all searches and seizures, but unreasonable searches and seizures." Terry v. Ohio, 392 U.S. 1, 9 (1968). The Sixth Circuit recognizes "three types of permissible encounters between the police and citizens: '(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." United States v. Waldon, 206 F3d 597 (6th Cir. 2000) (citing United States v. Avery, 137 F.3d 343, 352 (6th Cir. 1997)). "[S]ome physical touching of the person of the citizen" can indicate that a seizure occurred, especially when combined with "the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Gross, 662 F.3d 393, 399 (6th Cir. 2011) (quoting United States v. Mendenhall, 466 U.S. 544, 544 (1980)).

A brief investigative stop, or Terry stop, can be used by police if an officer points to "specific, articulable facts that give rise to a 'reasonable suspicion' that the suspect was engaged in criminal activity.'" Id. (quoting Terry v. Ohio, 392 U.S. 21 (1968)). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." United States v. Sokolow, 490 U.S. 1, 7 (1989). "A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" United States v. Baldwin, 114 F. App'x. 675, 679 (6th Cir. 2004) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). "[A]ny subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the

6

initial interference." United States v. Davis, 430 F.3d 345 (quoting United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999), cert denied, 528 U.S. 1176 (2000)).

In the course of a Terry stop, police are permitted to engage in "a reasonable search for weapons for the protection of the police officer, where he has reason to believe he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime[.]" Terry, 392 U.S. at 27. Terry does not require that the officer be certain "that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. The search must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Id. at 29.

V. **ANALYSIS**

a. *Objection to Proposed Findings of Fact*

Defendant "dispute[s] and disagree[s] with the facts in the [Report and Recommendation]" but concedes that "the report accurately summarizes the testimony from the hearing." (ECF No. 41 at PageID 99.) Defendant disputes that "part of the reason Officer Linn frisked Mr. Richard was because he noticed a bulge on Mr. Richard's left leg near his pants pocket" because "Officer Linn never testified to this [and rather] testified that he frisked Mr. [Richard] because he was informed he had a gun in one of his pockets." (ECF No. 41 at PageID 100 (quoting ECF No. 40 at PageID 74; ECF No. 36 at PageID 58).) This is not, however, a challenge to the Magistrate Judge's proposed findings of fact, but rather to the analysis. The Magistrate Judge's proposed finding of fact related to the pocket bulge cites the body camera footage, not the testimony of the officer, and states: "Moments after grabbing Defendant's arm,

7

Officer Linn can be seen patting down Defendant's front left pocket, which had a noticeable bulge. (Ex. 1 at 0:01:35.)" (ECF No. 36 at PageID 55.)

Because this objection does not address the Magistrate Judge's factual findings, review of the transcript and associated exhibits reveal that Defendant's front left pocket had a noticeable bulge, and the Magistrate Judge's factual findings are consistent with the evidence presented at the suppression hearing, the Court **ADOPTS** the proposed factual findings of the Magistrate Judge.

  b. *Immediate Detention*

Defendant argues that Officer Linn did not have time to develop reasonable suspicion because he seized Mr. Richard immediately on encountering him at 805 Hudson, and that there was "not enough reasonable suspicion to immediately detain Mr. Richard [because] Mr. Richard was there to help someone move [and] Trespassing was simply an allegation at that point." This analysis ignores the totality of the circumstances, instead confining the assessment of circumstances to the instant of the encounter.

Officer Linn had been working for the Memphis Police Department for 15 years, thirteen of which were spent patrolling the area of 805 Hudson. (Tr. at 7:3-21.) Officer Linn knew the house at 805 Hudson to be a high-crime address. (Tr. at 12:5-12 (In thirteen years, Officer Linn had been to the house "probably a hundred [times] . . . So many times that I can't really qualify.").); see also Hoover v. Walsh, 682 F.3d 481, 495 (6th Cir. 2012) (presence in a high-crime area among relevant contextual considerations in a Terry analysis). Officer Linn had been called to 805 Hudson earlier in the day, saw that the house was "locked and the house was closed up," and arrested a woman for trespassing. (Tr. at 24:20-26:25.) At that time, he talked

to representatives of the company that owned the home, Memphis Passive, who informed both the trespasser and her friends that "they weren't allowed at the house . . . and . . . not to come back." (Tr. at 8:7-10, 11:19; 15:21-24.) In the body camera footage, the home appears to be a small, single-family home, not a multi-family unit or apartment facility. (Ex. 1.)

When Officer Linn returned to the property later that day, he had been informed by dispatch that someone was trespassing at 805 Hudson. (Tr. at 6:3-6, 19:15-20:5.) The caller described a Black man in black pants and a beige top. (Ex. Ex. 2 at 0:30-2:05.) On arrival, representatives from the company were again present, informed Officer Linn that there were multiple people trespassing in the house, and that the only man in the group had a firearm. (Tr. at 11:19-22 ("One of them, the guy, had a firearm on him.")) When Officer Linn then encountered a man in black pants and a beige layer under a red jacket exiting the house, he then formed a reasonable suspicion that that individual was the man described in the phone call. The narrow length of time of the encounter is immaterial given the surrounding circumstances: this was a small house that Officer Linn had previously seen locked, and Officer Linn heard that there was only one male in the group of trespassers inside. Defendant's argument that the length of encounter was insufficient to form reasonable suspicion is therefore unavailing.

Nor does Defendant's argument that "Officer Linn knew that Mr. Richard was there to help someone move" foreclose Officer Linn forming reasonable suspicion. (ECF No. 51 at PageID 102.) Contrary to Defendant's assertion, helping someone move and trespassing are not mutually exclusive. Especially given that a female individual had been arrested for trespassing in the residence earlier in the day, given a time period to remove her belongings, and told not to return after that, complaints about trespassers made by the same company on the same day would suggest that "helping someone move" would likely constitute trespassing if the

9

time period given had elapsed. (Tr. at 15:16-24.) Accordingly, that the 911 caller stated that the individual may be "helping someone move" does not suggest that Officer Linn could not form reasonable suspicion at the time he encountered Mr. Richard.

Consistent with the analysis of the Magistrate Judge, and given the totality of the circumstances surrounding Mr. Richard's investigative detention, the Court **ADOPTS** the Recommendation of Magistrate Judge Claxton, **FINDS** the investigative detention was not unlawful, and **DENIES** Defendant's Motion to Suppress.

c. *Frisk*

Defendant argues that "Officer Linn had no objective basis to believe Mr. Richard was armed and dangerous" because even if "he was told at the scene that Mr. Richard possessed a firearm, that does not necessarily establish that he was dangerous." (ECF No. 41 at PageID 104.) Defendant essentially argues that "armed and dangerous" should be read disjunctively, and that Mr. Richard's reported possession of a firearm alone cannot justify a frisk. (Id.) Defendant also argues, without citation and contrary to the record, that the friend Mr. Richard was "helping remove . . . belongings from 805 Hudson . . . had a right to be present on the property." (ECF No. 41 at PageID 104.)

Officers "must have specific, articulable reasons to believe that a particular person is armed and dangerous before the officer may frisk a suspect." United States v. Noble. 762 F.3d 509, 523 (6th Cir. 2014) (citing United States v. Cortez, 449 U.S. 411, 417 (1981); Ybarra v. Illinois, 444 U.S. 85, 90-91 (1979); United States v. Di Re, 332 U.S. 581, 587 (1948)). In Terry, the Supreme Court made clear that "Officer[s] need not be absolutely certain that the individual is armed; the issue is whether a reasonable prudent man in the circumstances would be

10

warranted in the belief that his safety or that of others was in danger[,]" and that officers can "draw from the facts in light of his experience." Terry, 392 U.S. at 27.

There is no indication that Noble's "armed and dangerous" phrasing indicates a two-part test forbidding pat-downs when an Officer has articulable reasons to believe that a person subject to investigative detention is armed. Terry's formulation suggests that to be armed is to be dangerous to Officers conducting an investigative detention, an inference supported by the analysis of the Sixth Circuit. See, e.g. United States v. Branch, 537 F.3d 582. 589 (6th Cir. 2008) ("Colston was entitled to rely on his training and experience *that drug dealers frequently carry weapons* and thus the pat down was constitutionally permissible" where Officers conducted a frisk after finding narcotics and $10,000 cash."); United States v. Pacheco, 841 F.3d 384, 391-92 (6th Cir. 2016) (using "armed" and "dangerous" interchangeably); United States v. Stennis, 457 F. App'x 494, 499 (6th Cir. 2012) ("The officer's perception of a bulge suspected to be a weapon provides a reasonable suspicion that the individual may be armed and dangerous."). Similarly, Defendant's argument that because "[t]here was no allegation that Mr. Richard threatened anyone with a firearm or made threats that he would use a firearm to harm anyone[,]" he could not be considered "armed and dangerous" is in tension with the purpose of the cases Defendants cite in their brief and with the record. Defendants concede that "the Sixth Circuit has repeatedly ruled that a Terry stop allows officers to frisk a person *for the safety and protection of officers. . .*" (ECF No. 41 at PageID 103 (emphasis added) (citing United States v. Haywood, 506 F. App'x 424, 427 (6th Cir. 2012); Minnesota v. Dickerson, 508 U.S. 366, 378 (1993); United States v. Noble, 762 F.3d 509, 521 (6th Cir. 2014); United States v. Moore, 390 F. App'x 503, 506 (6th Cir. 2010); United States v. Garcia, 496 F.3d 495, 505 (6th Cir. 2007)).) Thus, while threats against other people would provide evidence that Defendant was

armed and dangerous, the lack of threats to others is not dispositive that his carrying of a firearm did not render him armed and dangerous to Officer Linn.

The record reflects Officer Linn had an objective basis to consider Defendant armed and dangerous in light of his experience. Officer Linn had been informed that a man was trespassing and behaving in a threatening way. Officer Linn was informed again by representatives of the property owners upon arrival at 805 Hudson that a man inside the house was trespassing and carrying a firearm. One could infer from the fact that the Memphis Passive representatives were aware of the firearm that the firearm had been observable by them and not carried in a concealed manner. Officer Linn was at a high-crime address, and the individual came out of the house with an apparent bulge in his pocket. Officer Linn confirmed with the property owners that this was the man they referred to as trespassing and carrying a firearm. Given this information, the surrounding facts of the likely repeated trespass, and Officer Linn's experience and awareness of the risk that a weapon "could unexpectedly and fatally be used against him," he had reasonable suspicion to believe that Mr. Richard was armed and dangerous. See Terry. 392 U.S. at 23-24.

Because Defendant's objections are inconsistent with the legal standards for precautionary frisks in the Sixth Circuit, the Court **ADOPTS** the Report and Recommendation of the Magistrate Judge, **FINDS** that the limited search by Officer Linn was lawful, and **DENIES** Defendant's Motion to Suppress.

    d.  *Statement*

Because there was no primary illegality, the Court need not consider whether Mr. Richard's subsequent statement was "fruit of the poisonous tree." The Court therefore **ADOPTS** the Report and Recommendation of the Magistrate Judge on this issue in full.

VI.     **CONCLUSION**

Because neither the investigative detention nor the "frisk" of Mr. Richard violated his Fourth Amendment right, Defendant's Motion to Suppress is **DENIED**.

**SO ORDERED**, this 6th day of August, 2024.

                                                       /s/ Jon P. McCalla
                                                       JON P. McCALLA
                                                       UNITED STATES DISTRICT JUDGE